267 N.J. Super. 130 (1993)
630 A.2d 857
LORI ANN McLAUGHLIN, PLAINTIFF,
v.
NISSAN MOTOR CORPORATION, U.S.A., DEFENDANT.
Superior Court of New Jersey, Law Division, Somerset County.
Decided June 11, 1993.
*131 Paul Faugno for plaintiff (Rogan and Faugno, attorneys).
Lynn D. Healy for defendant (Carpenter, Bennett and Morrissey, attorneys).
*132 ARNOLD, P.J.Cv.
In this product liability action, the plaintiff alleges that her 1986 Nissan Pulsar automobile had two design defects which proximately caused an eight inch scar on her forehead and scalp. The first alleged defect was that the A-pillar was too close to the driver's head and the second was that the A-pillar was not properly padded. The defendant moved for an involuntary dismissal at the end of the plaintiff's case and an order for judgment at the close of all the evidence on the ground that the plaintiff had failed to prove "enhanced injury" as required by the holding in Huddell v. Levin, 537 F.2d 726 (3d Cir.1976). This court held that because neither defect caused an "enhanced injury" the defendant's motions were denied. The jury returned a verdict in favor of the plaintiff and the defendant moved for a new trial. The motion for a new trial is granted because this court erred in not granting defendant's motion as to the second alleged defect.
On March 9, 1989, the plaintiff was driving her Nissan Pulsar automobile South on Route 202 in the area of Bernardsville, New Jersey. She swerved to avoid two deer that ran across the highway and the car went off the road and travelled 280 feet into a wooded area. Before stopping, the car sideswiped one or more trees. Although it is undisputed that the plaintiff was wearing an integrated lap and shoulder belt, she sustained an eight inch cut on the left part of her forehead which extended into her scalp. Three hundred stitches were required to close this wound, which left plaintiff with a substantial scar on her forehead and scalp.
An engineer accident reconstruction expert testified for plaintiff that the cut was caused by plaintiff's head striking the A-pillar of the car. The A-pillar is the steel roof support located between the driver's door and the windshield. The engineer accident reconstruction expert also testified that the Nissan Pulsar was defective because that pillar was too close to the driver's head, allowing the driver's head to strike the pillar even if the driver was wearing the integrated lap and shoulder belt. In addition, he testified that the *133 A-pillar was defective because it was only covered with a plastic cover and not padded.
A plastic surgeon testified for the plaintiff that the cut sustained by the plaintiff was caused by contact with a blunt object, such as the A-pillar and, over objection, testified that the plaintiff would have sustained a less serious wound if the pillar had been padded as opposed to having only a plastic cover. Significantly, the plastic surgeon admitted on cross-examination that he could not quantify the injury that the plaintiff would have sustained if the A-pillar had been padded except to say that plaintiff's wound would have been less serious. An engineer accident reconstruction expert called by the defendant, the distributor of the car, testified that the car was not defective and that the wound sustained by the plaintiff was caused when the car sideswiped a tree which struck the plaintiff's head.
As already noted, at the close of the plaintiff's case, the defendant moved for an involuntary dismissal pursuant to R. 4:37-2 and also moved for judgment at the close of all the evidence pursuant to R. 4:40-1. Both motions were based on the holding in Huddell supra, 537 F.2d at 738. Specifically, defendant argued that the holding in Huddell required a dismissal because plaintiff had not proven "enhanced injuries attributable to the defective product." Ibid.
The Huddell case is the leading case in a line of cases called "second collision" or "enhanced injury" cases. The facts in Huddell are as follows: Huddell was enroute from his home in Cherry Hill, New Jersey, to the Delaware State Hospital when his car ran out of gas on the Delaware Memorial Bridge. His car was brought to full stop in the left-most southbound lane of traffic and was struck in the rear by a car driven by the defendant, George Levin. Levin's speed was estimated at between fifty and sixty miles per hour when it struck Huddell's car. Because of the energy absorbing characteristics of the vehicles, the rear of Huddell's head struck the headrest on the driver's seat at a speed of ten miles per hour. With the exception of his head, Huddell *134 sustained superficial injuries, but the blow of his head against the headrest resulted in an "extensive fracture" to the occipital region of the skull. There was expert testimony that the headrest was defectively designed because it exposed Huddell's head to a severe sharp metal edge, and that this defect proximately caused his death. Suit was instituted against Levin, the driver of the vehicle which struck Huddell's car, Levin's employer, and against General Motors Corporation, the manufacturer of Huddell's car. As to General Motors Corporation, the complaint charged that the headrest installed in Huddell's car was defectively designed and unreasonably dangerous, and failed to give proper protection against a rear end collision such as occurred.
The Third Circuit Court of Appeals held that the plaintiff had the burden of proving "enhanced injuries" sustained by virtue of the allegedly defective headrest, Huddell, supra, 537 F.2d at 737, and that General Motors was only liable for enhanced injuries attributable to the defective product. Id. at 740. Specifically, the court held that the plaintiff must prove not only that the design in question was defective but must offer proof of an alternative safer design practicable under the circumstances, and the injuries that would have been sustained had the alternative safer design been used. Thus, the plaintiff is required to prove the extent of "enhanced injuries" due to defective design. Id. at 738. Defendant's motions in this case are grounded in the decision in Huddell. Defendant argues that the plaintiff introduced no evidence from which the jury could determine what "enhanced injuries" resulted from the alleged defects in the Nissan Pulsar.
Preliminarily, this court notes that jurisdictions have split on the issue of whether the plaintiff or the manufacturer has the burden of proving the "enhanced injury." One line of cases adheres to the holding of Huddell. See Cleveland v. Piper Aircraft Corp., 890 F.2d 1540 (10th Cir.1989). Another line of cases does not require a plaintiff to prove with specificity the "enhanced injuries" which flowed from the defect in a product. In this second line of cases, if the plaintiff can make a prima facie *135 showing of the existence of an injury-enhancing defect then the defendant has the burden of proving the apportionment between those injuries attributable to the "first collision" and those attributable to the alleged "enhanced injury" defect. See Shipp v. General Motors Corp., 750 F.2d 418 (5th Cir.1985); Mitchell v. Volkswagenwerk A.G., 669 F.2d 1199 (8th Cir.1982). No New Jersey case specifically adopts either line of cases. However, in Crispin v. Volkswagenwerk A.G., 248 N.J. Super. 540, 558, 591 A.2d 966 (App.Div.) certif. denied 126 N.J. 385, 599 A.2d 162 (1991), the Appellate Division appears, in dicta, to have accepted the Huddell line of cases requiring the plaintiff to prove "enhanced injury" in "second collision" cases. See also McWilliams v. Yamaha Motor Corp. USA, 780 F. Supp. 251, 259 (D.N.J. 1991), rev'd on other grounds, 987 F.2d 200 (3d Cir.1993) (interpreting Crispin as applying the crashworthiness doctrine in New Jersey). Accordingly, this court holds that the Huddell doctrine applies to "enhanced injury" cases.
The first alleged defect in the 1986 Nissan Pulsar is that the A-pillar is too close to the driver's head, permitting the driver's head to strike the A-pillar even if the driver is wearing the integrated lap and shoulder belt. Considering only this first defect, if it did not exist, plaintiff would not have been injured because her head would not have hit the A-pillar. In Huddell, the driver's head was supposed to contact the headrest in the event of a rear end collision such as occurred. The defect was not that Huddell's head hit the headrest but that the headrest, instead of reducing injury, caused "enhanced injury" because of the "second collision" with the headrest. In this case, however, absent the first alleged defect there would have been no "second collision" and no injury, thereby making the Huddell doctrine inapplicable. This distinction between an alleged defect that causes an "enhanced injury" from a "second collision" and one that causes injury is supported by the opinion in Barris v. Bob's Drag Chutes & Equipment Inc., 685 F.2d 94 (3d Cir.1982).
*136 The facts in Barris were as follows: Arnold Barris was driving a sprint race car in a race at the Tri-City Speedway in Pennsylvania. His car was equipped with a shoulder harness, lap belt, and arm restraints, and he was wearing a helmet. During the second heat of the race, the front wheel of Barris's race car collided with the left rear tire of another car in the race. The collision caused Barris's car to be catapulted into the air and it then flipped end-over-end a number of times before coming to rest on its wheels. Barris was killed.
Witnesses testified that, when the car was in the second flip, Barris's body appeared to come loose inside the roll cage of his car. Evidence produced at trial showed that his head, which was protected by a helmet, hit the roll bars of the car and that Barris was killed as a result of the injuries he sustained as the sprint car flipped end-over-end. After the crash, a rescue crew removed Barris's helmet, lap belt and arm restraints as they extricated him from his car. Witnesses who saw the car after the crash testified that the shoulder harness had disintegrated. There was testimony that the shoulder harness was in excellent condition when it, along with the rest of the car, was cleaned before the race.
Barris's sprint car, which he purchased new in 1975, came equipped with a Y-type shoulder harness. At the time of the accident, the car was equipped with a replacement Y-type shoulder harness which had been installed in 1977. This harness was manufactured by the defendant. The manufacturer sold its product to retailers, including Stan Hoover, Jr., Racing Enterprises, from whom Barris purchased it.
Expert testimony at trial indicated that the stitching on this shoulder harness was grossly inferior to the stitching on other harnesses with which it was compared. It was the expert's opinion that the shoulder harness failed because the inferior stitching on the harness broke during the collision, causing the harness to come apart. The expert testified that shoulder harnesses with more stitches and stitches arranged in a different way were stronger than shoulder harnesses with stitches like those in *137 Barris's car. In addition to the expert witness's testimony, four eyewitnesses testified that they had watched numerous sprint car races in which the cars flipped over and that they had never seen a driver, other than Barris, killed in one of these flips.
Barris's widow brought suit against Bob's, the manufacturer of the shoulder harness, and Hoover, the retailer of the harness, under the Pennsylvania Survival Act, 20 Pa. Cons. Stat. Ann. §§ 3371-3373 (1982), and the Pennsylvania Death Act, 42 Pa. Cons. Stat. Ann. § 8301 (1982). Plaintiff alleged that the car's defectively designed or manufactured shoulder harness failed to restrain Barris under normal use during the flipping episode, thereby causing him to strike the interior of the car and sustain fatal head injuries. Plaintiff relied on the strict product liability doctrine of the Restatement (Second) of Torts § 402A (1965), on negligence theory, and on a contract theory of warranties.
After the plaintiff presented her case, the District Court granted the defendant's motion for a directed verdict on the ground that the plaintiff had failed to present a prima facie case under the test articulated in Huddell, supra, 537 F.2d at 726. Specifically, the District Court ruled that the plaintiff had failed to demonstrate that the death would have been prevented had a better shoulder harness design been utilized.
The Third Circuit of Appeals reversed the district court and remanded for a new trial. Barris, supra, 685 F.2d at 102. Although the court recognized that under Pennsylvania law the Huddell doctrine applied to situations in which the defect did not cause the accident but rather increased the severity of the injury over that which would have occurred absent the defective design, Barris, id. at 99, it held that under the facts in Barris the Huddell doctrine was inapplicable because the defective harness had proximately caused Barris's injuries rather than having merely enhanced those injuries. Id. at 100. This distinction applies to the first alleged defect in this case, making the Huddell doctrine inapplicable to the first alleged defect.
*138 The second alleged defect in the 1986 Nissan Pulsar was that the A-pillar was not properly padded. The plaintiff's engineer accident reconstruction expert testified that the plastic cover of the steel A-pillar provided no protection and that it should have been padded, while the defendant's engineer accident reconstruction specialist testified that the air space between the plastic cover and the steel A-pillar was specifically designed to provide such protection. If there was no design defect in the location of the A-pillar, the plaintiff's proofs could have sustained a finding of a design defect in the failure to properly pad the A-pillar.
This court failed to distinguish, however, between this second alleged defect and the first alleged defect. This second alleged defect created an "enhanced injury" issue and the Huddell doctrine applies to this second defect. The testimony of the plastic surgeon that he could not quantify what injuries plaintiff would have sustained if the A-pillar had been properly padded did not satisfy the substantial burden of proof required by Huddell. See Caiazzo v. Volkswagenwerk A.G., 647 F.2d 241, 251 (2d Cir.1981).
Therefore, this court should have dismissed plaintiff's action as to this second alleged defect for failure to comply with the Huddell doctrine and permitted the jury to consider only the first defect. Since the jury was only asked to determine whether the Nissan Pulsar was defective it is not clear whether their verdict was based on the first alleged defect, the second or both.
Accordingly, defendant's motion for a new trial is granted.